UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case No.:  6:21-cv-

GENERATION IMPACT CONSULTING,
LLC, a Florida limited liability company,
DAVID THERAULT, an individual, DAVID
WALDY, an individual, and SANDRA
HASELEY, an individual,

       Plaintiffs,

       v.

MIND MINT, LLC, an Arizona limited
Liability company, and KBB, LLC, an
Arizona limited liability company,

       Defendants.

_____/

## COMPLAINT & DEMAND FOR JURY TRIAL AND DECLARATORY RELIEF REQUESTED

Plaintiffs GENERATION IMPACT CONSULTING, LLC ("**Generation Impact**"), DAVID THERAULT ("**Therault**"), DAVID WALDY ("**Waldy**"), and SANDRA HASELEY ("**Haseley**"), hereby sue Defendants MIND MINT, LLC ("**Mind Mint**"), and KBB, LLC, ("**KBB**"), and demand trial by jury and declaratory relief.

## JURISDICTION AND VENUE

1.      This is an action for declaratory judgment and for damages.

2.      At all times material hereto, Generation Impact has been a limited liability company organized and existing under the laws of Florida with a principal place of business at 2954 Trasona Drive, Melbourne, Florida 32940. Generation Impact's only members are the remaining Plaintiffs in this action—Therault, Waldy, and Haseley ("**Individual Plaintiffs**").

3.      At all times material hereto, Therault has resided in Brevard County, Florida, with Florida citizenship.

4.      At all times material hereto, Waldy has resided in Lexington, South Carolina, with South Carolina citizenship.

5.      At all times material hereto, Haseley has resided in East Amherst, New York, with New York citizenship.

6.      At all times material hereto, KBB has been a limited liability company organized and existing under the laws of Arizona with a principal business address of 149 Paseo Del Sol Avenue, Lake Havasu City, Arizona 86403. KBB's only member is Matthew Balgord, who is an individual with Arizona citizenship.

7.      At all times material hereto, Mind Mint has been a limited liability company organized and existing under the laws of the State of South Dakota, and comprised of the following members: BBG Enterprises, LLC ("**BBG**"), Freedom

Magnet, LLC ("**FM**"), and Dean Graziosi ("**Graziosi**").

    **a.**    At all times material hereto, Mind Mint member Graziosi, has been an individual with Arizona citizenship.

    **b.**    At all times material hereto, Mind Mint member BBG has been a limited liability company organized and existing under the laws of Wyoming with a principal business address of 2225 N. Scottsdale Road, Scottsdale, Arizona 85257.

    **c.**    Mind Mint member BBG's only member is Graziosi.

    **d.**    At all times material hereto, Mind Mint member FM has been a limited liability company organized and existing under the laws of the State of South Dakota with a principal business address of 9051 Mira Mesa Boulevard, Suite 261229, San Diego, California 92126.

        **(i)**    Mind Mint member FM's only member is ATX Corporate Services, LLC ("**ATX**").

        **(ii)**    Mind Mint member FM's manager is Yogesh Babla, who is an individual with California citizenship.

        **(iii)**    Mind Mint member FM's organizer is Cindy L. Grossman, who is an individual with Texas citizenship.

        **(iv)**    At all times material hereto, FM member ATX has been a limited liability company organized and existing under the laws of the State of Texas with a principal business address of 100 Congress Avenue, Suite 1440, Austin, Texas 78701.

        **(v)**    FM member ATX's only member is Leslie C. Giordano, who is an individual with Texas citizenship.

    **8.**    As shown below, complete diversity exists in this action because Generation Impact and the Individual Plaintiffs ("**Plaintiffs**") are citizens of States that are different from Mind Mint and KBB ("**Defendants**"):

3

| The Parties | Defendants' Citizenships | Plaintiffs' Citizenships |
| --- | --- | --- |
| Generation Impact | | Florida, New York, and South Carolina |
| Haseley | | New York |
| Therault | | Florida |
| Waldy | | South Carolina |
| Mind Mint | Arizona, California, and Texas | |
| KBB | Arizona | |

9.      On or about August 2, 2021, Defendants—through their attorney—sent a "Cease and Desist" letter to Plaintiffs in Florida ("**Letter**"). A true and correct copy of the Letter (without enclosures) is attached hereto and incorporated herein by reference as **Exhibit A.**

10.     In the Letter, Defendants accused Plaintiffs of breaching a Strategic Marketing Agreement, which Generation Impact entered with Defendants on or about October 15, 2020 ("**Agreement**").  A true and correct copy of the Agreement is attached hereto and incorporated herein by reference as **Exhibit B**.

11.     In the Letter, Defendants threatened to "institute legal proceedings seeking injunctive relief and monetary damages" based on Plaintiffs' alleged breach of the Agreement's restrictive covenants ("**Litigation Threats**"). (*See* Letter, p. 4.)

12.     With the Letter, Defendants enclosed a draft Verified Complaint ("**Complaint**"), which included the following claims against Plaintiff under Arizona law: (a) Breach of Contract ("**Count I**"); (b) Misappropriation of Trade Secrets ("**Count II**"); (c) Breach of the Duty of Loyalty ("**Count III**"); and (d) Unfair Competition ("**Count IV**"). A true and correct copy of the Complaint is attached hereto and incorporated herein by reference as **Exhibit C**.

13.     With the Letter, Defendants also enclosed a draft Memorandum of Points and Authorities ("**Memo**") to support Defendants' threatened demand for injunctive relief. A true and correct copy of the Memo is attached hereto and incorporated herein by reference as **Exhibit D**.

14.     Through counsel, Generation Impact responded to the Letter through written correspondence dated August 12, 2021 ("**Response**"). A true and correct copy of the Response is attached hereto and incorporated herein by reference as **Exhibit E**.

15.     This Court has personal jurisdiction over Defendants because: (a) Defendants regularly conduct business in Florida; (b) the Agreement was formed in Florida; (c) by sending the Letter, the Complaint, and the Memo to Plaintiffs in Florida, Defendant purposely targeted Florida citizens (Generation Impact and Therault); and (d) Defendants' misconduct has and will cause Plaintiffs harm in Florida.

16.     From Plaintiffs' perspective, the monetary value at issue in this litigation, which includes damages for breach of contract and the value of Generation Impact unencumbered by restrictive covenants, exceeds the sum of $75,000.00 exclusive of interest, costs, and attorney's fees.

17.     Pursuant to 28 U.S.C. § 1332(a)(1), this Court has subject matter jurisdiction over Plaintiffs' claims.

18.     Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental subject matter jurisdiction over Plaintiffs' state law damages claims because such claims are so related to Plaintiffs' declaratory judgment claims "that they form part of the same case or controversy under Article III of the United States Constitution."

19.     Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because the claims arose in this District and a substantial part of the events or omissions giving rise to this action occurred in this District (specifically, Brevard County, Florida).

## THE AGREEMENT

20.     On or about October 15, 2020, Defendants and Generation Impact executed the Agreement. (*See* Exhibit B.)

21.     The Agreement does not include a venue selection provision, but it does state that the "Agreement is to be construed in accordance with the laws of the State of Arizona, excluding its conflict of law provisions." (*See* Agreement, ¶ 8.10.)

22. The parties agreed that Generation Impact, as an independent contractor, would "help Mind Mint to develop a three-stage mastery program" (consisting of three workshops) "to promote to Mind Mint's clients" ("**Mastery Program**"). (*See id.* at ¶ 1.1.1.; *id.* at ¶ 3 (listing Generation Impact's "Obligations" under the Agreement); *id.* at ¶ 8.2. (stating that the "parties to this Agreement are independent contractors").)

23. At Paragraph 1 of the Agreement, Defendants agreed that Mind Mint would compensate Generation Impact for its work on the Mastery Program as follows:

> Compensation is based on the development stage.
>
> (a) <u>Workshop Stage 1</u>**:** . . . Mind Mint has already paid [Generation Impact] $7,500.00 for the partial development of these Stage 1 workshops. Upon completion of final editing of the workshops, Mind Mint will pay [Generation Impact] and additional $17,500.00.
>
> (b) <u>Workshop Stages 2 & 3</u>: [Generation Impact] agrees to assist Mind Mint in the creation of two additional workshops. Mind Mint will pay [Generation Impact] $25,000 to complete per additional workshop[s]. Mind Mint will pay [Generation Impact] 50% of this fee at the time [Generation Impact] starts the workshop, and the remaining 50% upon completion.
>
> (c) <u>Speaking Engagements</u>: Mind Mint will also pay up to 3 of [Generation Impact's] employees or contractors $2,500.00 for speaking ad fulfilling at the aforementioned workshops.

24.     "The term of the Agreement is one (1) year from the date of its execution"—October 15, 2020 to October 15, 2021 ("**Term**"). (*See* Agreement, ¶ 4.1.) During such Term, "there cannot be a unilateral termination of the Agreement." (*See id*.) Rather, the Agreement was "not terminable, except for cause" or upon the parties' mutual agreement. (*See id*.) "Cause for the purpose of the Agreement is defined as any willful breach of the Agreement." (*See id*.)

25.     Mind Mint agreed to pay Generation Impact "all royalty and other payments due," notwithstanding termination of the Agreement.  (*See id*. at ¶ 4.3.)

26.     Pursuant to Paragraph 8 of the Agreement, Generation Impact's potential liability was limited as follows:

> [Generation Impact] shall not be liable for misconduct of [Generation Impact] and/or the [Generation Impact] parties. [Generation Impact] and its respective affiliates', successors, assigns, employees, agents, directors, and officers assume no responsibility or liability which may arise from [Generation Impact's] acts, omissions, representations, or other activities arising out of, relating to, or in furtherance of this Agreement and/or [Generation Impact's] Services.

(*See id*. at ¶ 8.4.3 ("**Liability Limits**"); *see also id*. at ¶ 8.4.2.)

27.     Paragraph 7 of the Agreement sets forth three restrictive covenants— a "Non-Disclosure Covenant", a "Non-Solicitation Covenant", and a "Non-Competition Covenant" (*id.* at ¶ 7.3) (collectively, the "**Restrictive Covenants**").

**28.**     The Non-Disclosure Covenant provides, in pertinent part:

During the term of this Agreement and thereafter (a) the recipient shall hold the disclosing Party's Confidential Information in strict confidence; and (b) the recipient shall not: (i) use the disclosing Party's Confidential Information for any purpose other than to perform its obligations under this Agreement; (ii) disclosing [sic] the disclosing Party's Confidential Information to any third party . . . .; (iii) copy, in whole or in part, the disclosing Party's Confidential Information, except as authorized in writing by the disclosing Party. . . .

(*Id*. at ¶ 7.1.1.)

**29**.     The Non-Solicitation Covenant prohibits solicitation of the parties' employees during the Term "and for six (6) months thereafter . . . ." (*See id*. at ¶ 7.2.1.)

**30**.     The Non-Solicitation Covenant also prohibits solicitation of the other Party's "suppliers," and "existing Clients" during the Term "and for one (1) year thereafter . . . ." (*See id*. at ¶ 7.2.2.)

**31.**     The Non-Competition Covenant purports to prohibit Generation Impact from "directly or indirectly" competing "with Mind Mint and its successors and assigns during the period of this Agreement and for a period of one (1) year following termination of services and notwithstanding the cause or reason for termination." (*See id*. at ¶ 7.3.1.)

**32.**     The Agreement defines "not compete" as follows: "The term 'not compete' as used herein shall mean [that Generation Impact] shall not own,

manage, or operate a business substantially similar to or competitive with the present business of Mind Mint." (*See id*. at ¶ 7.3.2.)

33.     With respect to geographic restrictions, the Non-Competition Covenant confusingly provides that it "shall extend to all nationwide legal tech providers from which any Mind Mint" [sic].  (*See id*.)

## TIMELINE

34.     In 2019, Therault, Haseley, and Waldy ("**Individual Plaintiffs**") became clients of Mind Mint, each having purchased a Mind Mint online course concerning how to run mastermind and workshop programs ("**Mastermind Programs**").

35.     By purchasing the Mastermind Programs, the Individual Plaintiffs gained access to a private Facebook group hosted by Mind Mint ("**MM FB Group**").

36.     Later in 2019, Mind Mint held an online contest ("**Contest**"), which was open to clients who purchased the Mastermind Programs.

37.     Having "won" the Contest, the Individual Plaintiffs became eligible to join a new Mind Mint speaking team.

38.     The Individual Plaintiffs applied and were accepted as "contracted coaches" for Mind Mint ("**MM Coach**").

39.     Initially, the Defendants flew the Individual Plaintiffs to Mind Mint headquarters in Arizona ("**First Trip**").

**40.**   During the First Trip, Defendants' agents expressed an interest in establishing a joint venture with the Individual Plaintiffs.

**41.**   Thereafter, the Individual Plaintiffs participated in Mind Mint workshops as MM Coaches.

**42.**   In January 2020, the Individual Plaintiffs formed Generation Impact in Florida, then they worked to advertise and build Generation Impact. In addition to coaching services, Generation Impact also marketed and sold a product ("**The Academy**"), which shared some similarities with the Mastery Program.

**43.**   The formation and growth of Generation Impact was well known to and acknowledged by Defendants. In fact, in a recorded communication between Generation Impact and Mind Mint, Graziosi explicitly stated that Mind Mint did not object to the formation and growth of Generation Impact ("**Graziosi Assurance**").

**44.**   In September 2020, an agent of Mind Mint—Teresa Peterson ("**Peterson**")—solicited Generation Impact to build a workshop for Mind Mint.

**45.**   Responding to Peterson's solicitation, Generation Impact memorialized in writing, and verbally pitched, a workshop to Mind Mint ("**Workshop Pitch**").

**46.**   After the Workshop Pitch, the parties verbally agreed that Generation Impact would "consult" for Mind Mint by continuing to act as MM Coaches and providing Mind Mint with feedback and improvement suggestions for one to two hours after each Mind Mint workshop.

**47.**   Satisfied with Generation Impact's consulting, Mind Mint requested that Generation Impact take over certain workshop development tasks ("**Workshop Project**").

**48.**   Initially, Generation Impact proposed that they would be willing to take on the Workshop Project for a profit share of 10% of workshop revenue ("**Profit Share Proposal**"). Generation Impact explained that it was making the Profit Share Proposal because the workshop material Mind Mint requested from Generation Impact was similar in nature to programs that Generation Impact was already selling ("**Impact Programs**"); thus, Generation Impact would lose revenue if required to cease promotion and sales of its Impact Programs.

**49.**   At a subsequent meeting held via Zoom ("**Zoom Call**"), Mind Mint proposed a fixed fee compensation structure for the Workshop Project ("**Fixed Fee Proposal**"), and Generation Impact (through Therault) reiterated its concerns that Impact Products could be viewed as competition or at conflict with the Workshop Project. Specifically, Therault told Mind Mint: "I just don't think we can do that because we will be giving you guys material that we already teach and we do not want to create a conflict or competition."

**50**.   Responding for Mind Mint on the Zoom Call, Jeremy Gabbert ("**Gabbert**") unequivocally stated: "You guys don't have to stop selling your program, we don't see you as a competition and we don't believe it will be a

problem" ("**Gabbert Assurance**").

51.     Further responding for Mind Mint on the Zoom Call, Joshua Bratcher ("**Bratcher**") urged Generation Impact to accept the low fixed fee because "this is a really big opportunity for you. Dean [Graziosi] really wants to get to know you and try working with you for this contract and afterwards he would like to talk about some bigger projects in the future! I know it might not be a lot of pay but the opportunity will be worth it" ("**Bratcher Assurance**").

52.     Reasonably relying on the Graziosi, Gabbert, and Bratcher Assurances, Generation Impact verbally agreed to take on the Workshop Project and immediately started work on a workshop for a Mind Mint event that was scheduled in less than two weeks ("**Stage I Workshop**").

53.     In early October, Mind Mint: (a) paid Generation Impact $7,500.00 for commencing development of the Stage I Workshop; and (b) presented the Agreement to Generation Impact.

54.     With respect to the Agreement, Generation Impact—through Therault—again expressed concerns to Gabbert: "I don't think we can move forward with this contract because it has a non-compete and non-solicitation agreement in here, and like we said on our zoom meeting, we already have a product that might be considered 'competition', [and] we already share a number of clients with you guys because we market our services to the same group of people."

55.     On behalf of Mind Mint, Gabbert responded: "[I]t's really just a formality. We don't care that you are running a program that has similar material" ("**2d Gabbert Assurance**").

56.     Reasonably relying on Mind Mint's Assurances concerning the intended scope of the ambiguous Restrictive Covenants, Generation Impact executed the Agreement.

57.     Acting in good faith, Generation Impact then provided services to Mind Mint as the Agreement required.

58.     As expected, Defendants' actual and prospective clients approached Generation Impact about the programs offered by Generation Impact ("**Client Query**").

59.     In response to the Client Queries, Generation Impact consistently responded: "[W]e can't tell you which program to sign up for. We can simply tell you what our program is and you will have to decide if it is right for you." ("**Client Response**").

60.     As part of Generation Impact's good faith efforts to facilitate open communications among itself and Defendants, Generation Impact notified Mind Mint—specifically Peterson—of the Client Query and Client Response ("**Client Notice**").

61.     Expressing gratitude for the Client Notice, Peterson approved the Client

Response and further said: "[I]t is not a big deal if they [clients] work with you guys, and in fact you might even be able to serve them better because we cannot help them in a one-on-one capacity like you guys can and these particular clients need more attention to accomplish their goals" ("**Peterson Statements**").

62.     Reasonably relying on the Peterson Statements, Generation Impact established a policy of providing the Client Response when approached by known clients of Mind Mint ("**Client Policy**").

63.     Pursuant to the Client Policy, which Generation Impact published on Facebook, Generation Impact would not initiate contact with any known Mind Mint clients. Further elaborating on the Policy, Waldy instructed Generation Impact representatives as follows: "if they ask about it [aka solicit] one of our team members about our free Facebook group, products or services], cool, if they find it otherwise [meaning if the clients find the information on their own], cool." Generation Impact also would not allow any of its representatives to "directly invite someone from [the] KBB [aka Mind Mint, LLC] Mastery Program because it can be perceived as poaching."

64.     In January 2021, Generation Impact rebranded The Academy product, named it "The Academy 2.0", and initiated a passive marketing campaign on Generation Impact's Facebook page and other social media ("**Academy Promotion**").

65.     The Academy Promotion was effective in that many people applied to join ("**Prospective Academy Clients**").

66.     Unbeknownst to Generation Impact, some of the Prospective Academy Clients were also clients of Mind Mint.

67.     When Generation Impact was made aware of an overlap between a Prospective Academy Client and a Mind Mint client, Generation Impact acted promptly to advise such client that Mind Mint was not involved in any way with the Academy Promotion.

68.     In its consulting work for Mind Mint, Generation Impact was required to interact with Mind Mint clients during online workshop events ("**MM Events**"), and such interactions were monitored by Mind Mint.

69.     With the exception of one innocent mistake on or about March 17, 2021 ("**Mistake**"), Generation Impact never knowingly solicited Mind Mint clients. In fact, outside of the MM Events, Generation Impact did not knowingly interact with such clients.

70.     The Mistake occurred when Haseley inadvertently responded to Marla Sacks' query to Haseley on the MM FB Page by posting "Zero To Launch in our free group!!!" ("**FB Post**").

71.     Mind Mint promptly identified and deleted the FB Post, and it had Gabbert contact the Individual Plaintiffs to ask for an explanation concerning the

Mistake ("**Explanation Request**"). Generation Impact possesses a true and accurate recording of such Explanation Request.

72.     In response to the Explanation Request, Haseley and Therault promptly explained Haseley's inadvertent posting, apologized, and assured Mind Mint—through Gabbert—that the Mistake would not recur ("**Mistake Responses**"). Generation Impact possesses true and accurate recordings of such Mistake Responses.

73.     In another audio recording, Gabbert can be heard accepting the Mistake Responses and apologies from Generation Impact. Generation Impact possesses true and accurate recordings of Gabbert's statements.

74.     Despite accepting Generation Impact's apologies and Mistake Responses, after March 26, 2020, communications between Mind Mint and Generation Impact largely ceased without explanation.

75.     Before communications largely ceased, Generation Impact completed and was paid for the first two workshops, and it commenced work on the third workshop as requested by Mind Mint (through Peterson).

76.     In contravention of the Agreement's payment terms Mind Mint did not pay $12,500.00 to Generation Impact when it commenced work on the third workshop ("**Third Workshop Payment**"). (*See supra* ¶ 23 (quoting the Agreement's compensation terms).)

77.     On or about March 3, 2021, Generation Impact made a written request for Mind Mint to make the Third Workshop Payment in accordance with the Agreement ("**1st Payment Request**").

78.     In response to the 1st Payment Request, on or about March 5, 2021, Mind Mint—through Peterson—advised Generation Impact that she would communicate with Mind Mint's accounting department, which would then issue payment to Generation Impact ("**1st Payment Promise**").

79.     Despite the terms of the Agreement and the 1st Payment Promise, Mind Mint did not pay the Third Workshop Payment to Generation Impact.

80.      Accordingly, Generation Impact—through Therault—made another written request for payment to Patterson ("**2d Payment Request**").

81.     When Patterson did not respond to the 2d Payment Request, on or about March 15, 2021, Generation Impact—through Therault—brought Mind Mint's payment misconduct to the attention of Mind Mint's CEO (and Graziosi's nephew) Tanner Sheldon ("**Sheldon**").

82.     The next day, on or about March 16, 2021, Gabbert sent an email to Therault ("**Gabbert Email**"), advising that any communications should go through him—not Sheldon.

83.     On the day of the Gabbert Email, Therault had a 23-minute telephone call with Gabbert, who advised Therault that Mind Mint would not pay Generation

Impact because Mind Mint decided to "put a hold on the third workshop for now" (**"Holding Statement"**). Thereafter, Gabbert and Peterson similarly advised that Mind Mint's refusal to pay Generation Impact was due to a "holding pattern."

84.     Although Generation Impact expressed that it was willing and able to finish working on the third workshop and fulfill its obligations under the Agreement, without explanation Mind Mint finished the third workshop without Generation Impact's assistance.

85.     When the third workshop was not successful, and without notifying Generation Impact, Mind Mint—through Graziosi—unsuccessfully solicited help from two of Generation Impact's contractors (**"Mind Mint's Solicitation"**).

86.     Despite repeated requests, Mind Mint has not paid Generation Impact the remaining sums due under the Agreement—$40,000.00 for the third workshop and third workshop speaking fees.

87.     Because of Mind Mint's misconduct in breaching the Agreement and threatening Plaintiffs with the Letter, Plaintiffs have been required to retain attorneys, and Plaintiffs are obligated to pay such attorneys a reasonable hourly rate for time spent on this matter.

## COUNT I: DECLARATORY JUDGMENTS

**88.**    Plaintiffs reallege and incorporate by reference the following paragraphs of this Complaint: 9–14, 20–34, 37–87.

**89.**    "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

**90.**    As reflected in the Letter and Generation Impact's response to the Letter ("**Response**"), an actual controversy has arisen and now exists between Plaintiffs and Defendant concerning their respective rights and obligations under the Agreement. A true and correct copy of the Response is attached hereto and incorporated herein by reference as **Exhibit E**. (*See supra* ¶¶ 9–14, Exhibits A & B.)

**91**.    Defendants wrongfully contend that Plaintiffs have breached the Agreement's Restrictive Covenants and Defendants are entitled to damages and injunctive relief.

**92.**    Plaintiffs deny that they have breached the Agreement and contend that: (a) the Restrictive Covenants are unenforceable under Arizona law (*see* Exhibit E); (b) Defendants actually breached the Agreement (*see infra* ¶¶ 96–102); and (c) based on the statements made on behalf of Defendants by Graziosi, Gabbert, and Peterson, which Plaintiffs reasonably relied on (*see supra* ¶¶ 41–43, 50–57, 73–78), the

20

Defendants are equitably estopped from claiming that Plaintiffs have violated any of the Restrictive Covenants.

93.   Based on the Letter, Plaintiffs have a reasonable apprehension that Defendants will sue them, and if successful, Generation Impact would be forced out of business. (*See* Exhibits A, C, D & E.)

94.   To resolve the parties' actual controversies and alleviate Plaintiffs' reasonable and justified apprehension, Plaintiffs request that the Court provide judicial determinations that:

(a)   the Restrictive Covenants are unenforceable under Arizona law (*see* Exhibit E);

(b)   Defendants are equitably estopped from claiming that Plaintiffs breached the Restrictive Covenants; and

(c)   even if the Restrictive Covenants are enforceable, Defendants may not enforce them because Defendants materially breached the Agreement by:

(i)   unilaterally terminating the Agreement without cause (*see supra*, at ¶¶ 74–84; ; *infra*, at ¶¶ 96–102);

(ii)   failing to pay Generation Impact the sums due under the Agreement (*see supra*, at ¶¶ 76–86; *infra*, at ¶¶ 96–102); and

(iii)   attempting to solicit two of Generation Impacts' contractors (*see supra*, at ¶¶ 85; *infra*, at ¶¶ 96–102).

95.   The judicial determinations requested by Plaintiffs are necessary and appropriate at this time in view of the controversy between the parties.

## COUNT II: BREACHES OF CONTRACT

**96.** Plaintiffs reallege and incorporate by reference the following paragraphs of this Complaint: 19–86.

**97.** On or about October 15, 2020, Defendants and Generation Impact entered into a written contract—the Agreement. (*See supra*, ¶¶ 20, 56 & Exhibit B.)

**98**. Until Defendants effectively terminated the Agreement in March 2021, Generation Impact performed its obligations under the Agreement and did not breach the Agreement. (*See supra*, ¶¶ 57, 60, 68, 76, & 84.)

**99**. Defendants effected a unilateral termination of the Agreement without cause—that is, without Generation Impact's willful breach of the Agreement. (*See supra* ¶ 25 (quoting paragraph 4.1 of the Agreement); *see also supra* ¶¶ 83–87.) In doing so, Defendants materially breached the Agreement.

**100.** Despite Generation Impact's demands, Defendants refused to pay the compensation owed to Generation Impact under the Agreement. (*See supra*, ¶¶ 23, 25 & 77–87.) In doing so, Defendants materially breached the Agreement.

**101.** In soliciting two of Generation Impact's contractors, Defendants again materially breached the Agreement.

**102**. As a result of Defendant's breaches of the Agreement, Generation Impact has suffered and will continue to suffer damages. (*See supra* ¶¶ 85–87.)

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows.

A.   On the First Claim for Relief, Plaintiffs respectfully request that the Court declare that the Restrictive Covenants are ambiguous, overly broad, and unenforceable under Arizona law.

B.   On the First Claim for Relief, Plaintiffs also respectfully request that the Court declare that Defendants may not enforce the Agreement because they are estopped from doing so, and because they have breached the Agreement.

C.   On the Second Claim for Relief, Plaintiffs respectfully request an award of compensatory and consequential according to proof at trial.

D.   Plaintiffs also respectfully request:

  i. an award of reasonable costs—including attorneys' fees—incurred by Plaintiffs in this action;

  ii. an award of prejudgment and post-judgment interest; and

  iii. such other and further relief as the Court may deem just and appropriate.

Dated:  August 20, 2021          Respectfully submitted,

s/ Colleen A. Conley
David J. Volk, Esq.
Florida Bar #0712949
Email: dvolk@volklawoffices.com
Colleen A. Conley
Florida Bar #0526861
Email:  cconley@volklawoffices.com
Volk Law Offices, P.A.
One Harbor Place
1901 S. Harbor City Blvd., Suite 700
Melbourne, Florida 32901
Telephone: (321) 726-8338
Facsimile: (321) 726-8377

Counsel of Record for Plaintiffs